Our final case for today is People v. Robert Brint Taylor, Case No. 5-16-05-06. You may proceed. May it please the Court, Counsel Camden. I'm Terry Green from West Frankfort. I represent Robert Brint Taylor, also of West Frankfort, who was convicted at bench trial out of the Circuit Court of Franklin County. The Honorable Thomas Foster presiding a lengthy bench trial on the charge of aggravated discharge of a firearm and also a charge of reckless discharge of a firearm. Events arose out of the June 5, 2010, wherein a call was received at the Franklin County Sheriff's Department that was recorded of some type of an event where a woman by the name of Tina Nebel and two of her foes, her boyfriend Mr. Hopper and a friend by the name of Billy Laws, who were in the tree business, the landscaping business, claiming that there was an instance of their neighbor shooting at them. The evidence at the bench trial showed that Ms. Nebel and Mr. Hopper lived out on George Prairie Road. Across from them, up on a hill, was the home of Mr. Taylor. Now, this case resolves, basically, there were two types of evidence presented at trial by the State. One being the police officers, what we would call, I don't know, professional individuals, and then there were the lay witnesses. The lay witnesses, at least called by the State, was Ms. Nebel, Mr. Hopper, and Mr. Billy Laws. Mr. Laws testified that he was the driver of the truck that he pulled out onto George Prairie Road to take their load of trees. When they got down the road a brief distance, that there was a gunshot that went through the, or, excuse me, he said there was a, I think projectile may have been the term he used, but anyway, where they had gone through part of the one side, he said the driver's side of the truck cabin, and they exited the other side. Now, it was after this time, the police had already set up a perimeter about a quarter of a mile to a half a mile away from the property. The way the geography is set up there is the police set up around a wooded area by Girish Prairie Road. Okay, so the events actually which led to the, or I believe would be the proof offered by the State at the trial, is that the shooting occurred at a time when the truck in which Mr. Hopper was, because he was the alleged victim who was injured in this event, it occurred as the truck went onto Girish Prairie Road. Ultimately, they pulled down where the police were able to find Mr. Hopper. He was bleeding from about his head, and ultimately the police went to, once they had secured the area there, they went to Mr. Taylor's home. Ultimately, they got a search warrant and searched, and they found firearms in Mr. Taylor's home. Also found were some spent shells out in the yard, and the spent shells were found to come from one of the rifles. I believe that they introduced in the evidence three, excuse me, shells from the shotgun. I said the rifle, I meant the shotguns. Anyway, Mr. Taylor. Was there ever a forensic match to what came through the truck causing the injury to your client's guns? No, Your Honor. There was no, the crime scene technician testified, at least on cross, that he did not take, he did not recover anything from the home of Ms. Neible. Either anything from the structure itself, or from the truck, or the yard, or I believe there was an outbuilding also. That he found nothing. There was basically the only evidence that the forensic people came up with was laying about, amongst a group of shells, that the shell had been fired from one of the shotguns of Mr. Taylor. Of course we introduced, through the testimony of Mr. Taylor's pastor, that they shot regularly on his property, and there were shells all over the place. Anyway, the evidence boils down to principally the police witnesses, but the only occurrence witnesses that testified were Hopper, Neible, and Mr. Laws. Mr. Laws admitted that he was a convicted felon. He also testified that he was a drug addict, or a former drug addict. Mr. Hopper testified that it was Mr. Taylor who was shooting at him earlier, and then taking the position that Mr. Taylor was the one who fired the gun that broke the upper windows of the truck, above the passenger side, above the driver's side, excuse me, and the passenger's side. And all of this was all after midnight? Well, after midnight. I want to say it was after one o'clock, Your Honor. Anyway, the other occurrence witness would be Ms. Neible. Now, we had, in our post-trial, or at trial, we raised that the state had basically made two errors as far as it related to brain material, one being information about a brain injury of the occurrence witness, Mr. Hopper, and then the other, that during the pendency of the matter, apparently Ms. Neible was all the time, at least from what we saw, talking to the prosecutor's office, and we claimed that there was error in Brady violations by the state not giving us that information. I want to make sure, though, that in the Brady violation that you raised, you've also admitted that none of the information withheld was exculpatory. You're claiming that it could have been used as impeachment, but the material itself was not exculpatory. It was not expressly exculpatory, such as the witness saying somebody else fired the shot. That is correct. So how is it a violation? I mean, Brady is typically exculpatory. Well, it's not always exculpatory. That's why I said typically. Yes. If the evidence is such that it could be used to impeach a witness, in this case our claim that the brain injury should have been made available to us prior to trial and before Mr. Hopper testified. How do you think that would have helped you on an impeachment? I mean, a credibility issue again? Yes, Your Honor, because I had gotten to the point where there's basically the occurrence witnesses, because Mr. Laws doesn't say much of anything. So the occurrence witnesses that actually tried to say that it was Mr. Taylor was Mr. Hopper, the brain injured individual, and Ms. Neible. Now, Ms. Neible, on direct examination by the state, the transcript of the hearing of June the 28th, 16, at page 50, the state said, asked a question. Did you see him meeting Mr. Taylor that night with a gun as he was walking around? She stated, I don't know. No, I can't say that I've seen. I did or I did. That's the transcript of June the 28th. On page 16? No, page 50, lines 23 through 24. Now, when Mr. Hopper testifies, Mr. Hopper, we find out about the brain injury to which we objected. Mr. Hopper, the judge allowed me to go diagram, and he said, yes, I had an injury in 15. This trial was in 16. It was the night back in 2010, and he says basically that he had no long-term memory loss. He had short-term memory loss. And that's the point. We received that information from PC. Thank you, counsel. You have an opportunity for rebuttal. Yes, thank you. May I please record? Do you mind if I stand for a minute? Oh, please, please. You know I have back issues. Of course. So it's the state's position that the defendant failed to meet his burden of showing a Brady violation as to both pieces of alleged Brady information. And that's on both the first and third prongs of Brady. Number one, that information was favorable to him. And number two, that the information was prejudicial or that alleged nondisclosure was prejudicial to him. And what is the standard of review? So we have the prejudicial issue. Right. And what was the first one again? The defendant has to show that an alleged Brady violation prejudiced him and also that the material was favorable to him. Favorable. And the state's argument that he failed to prove either of those. Now, the standard of review would be abuse of discretion. And the trial court did deny the defendant's Brady claim below. I would note that that claim only referred to the Niebel information, not the Hopper information. The defendant on appeal concedes that the Hopper claim wasn't adequately preserved. I'd note that his reply brief doesn't request plain error review. Wait a minute. So the Hopper claim in its entirety then wasn't preserved. He hasn't asked for it even on appeal. He hasn't asked for plain error review of it. No, Your Honor. In his reply brief. No, Your Honor. He does not. The state would take the position, I assume, that we can't even consider the Hopper issue. Correct, Your Honor. The state's arguing that the defendant can't meet his burden of showing plain error if he hasn't made the plain error argument so that this court should honor the procedural default. I would note as a factual matter that the shooting actually started before the truck pulled out, just as a factual matter to clear that point up. On the merits of the Hopper claim, I do feel compelled to note that the evidence was that the charge events occurred in 2010, that in 2015 Hopper was in a motorcycle accident and suffered some sort of a brain injury. The trial was in 2016, and at that trial he testified that he had had short-term memory loss since the accident, since the 2015 accident, but that the head injury did not affect his memories prior to the accident. The charge events occurred in 2010, five years before the accident, and he testified that his memory of the charge events was intact. That's why the state is arguing that the information regarding Hopper's brain injury was not favorable to the defendant for purposes of impeachment because the relevant memories were unaffected. It wasn't useful to impeach Hopper's memories because he testified that he remembered the incidents just fine. I note that the defense, once it learned of Hopper's injuries, didn't try at trial to use that information to impeach Hopper's credibility. It relied on Hopper's prior felony conviction. So the defendant knew at trial about the 2015 brain injury, learned about it first at trial, though. Yes. One of the questions I had is if this was not so important, why did the state ask about it at the bench trial? I mean, it seems like, you know, why make this an issue if it's not important? Right. Well, I don't know. Of course you would. I would note that Mr. Hopper apparently, according to the records, suffered some pretty visible physical injuries and maybe the state wanted to make a record as to that. Yeah, I just found it, you know, very odd that the state would bring that forward if it wasn't a big deal, if they didn't think it was a big deal. It's almost like they were explaining something, which is, you know, take the wind out of their sails kind of thing. Perhaps. But I know also that the defense did extensively cross-examine Mr. Hopper about the matter. So the question is what more could the defense have done? Right. Well, I suppose that's the... I mean, if you say to us that they learned about it, they questioned extensively on it, so they got their day in court kind of thing, right? Well, I think the questioning went to his competency as a witness. That was how it was argued in the court below. And the trial court held that he was competent, that he understood his oath, and he had a memory of what happened, and so he was a competent witness. In any event... So I just want one more question, I promise. So how could the defendant then argue, why would the defendant then argue that this information was a Brady violation? I don't know, Your Honor. He didn't argue that below, as I say. He argued that the Niebel information was a Brady violation. But in any event, the Hopper information can't have resulted in prejudice because the defendant's... Among the reasons is that the defendant's conviction didn't turn on Hopper's testimony. The court found Hopper credible based on the fact that his testimony was consistent with that of the two police officers who were staged down the road and also his girlfriend, Niebel, his employee laws, the 9-1-1 tapes, and the physical evidence. Well, talk about Niebel then. Beg your pardon? Talk about the Niebel issue then. The Niebel issue... That was preserved. Right. The defendant's claim is that Niebel's credibility could have been impeached with evidence that she bore the defendant some ill will due to an incident in which the defendant allegedly drove past her home and revved his vehicle engine. And the defendant's argument is that the State should have disclosed that. Now, again, the State's position is that the defendant hasn't shown that that information was favorable to the defendant or that non-disclosure could have resulted in prejudice. First, as to the not favorable, he hasn't shown that this incident, the revving incident, occurred before she testified. Again, his theory is that this incident would have prejudiced her against him such that it would have colored her testimony. And the facts are, there are some dates involved, and the facts are laid out in the State's answer brief. This was a bench trial that took place over a number of days, and it's not disclosed in the record exactly when this incident occurred, but it well could have occurred after she testified, in which case it couldn't have affected her testimony. And, of course, the silent record is construed against the defendant here. Another reason that the defendant hasn't shown that the information was favorable to him is that the information on his face is unfavorable to him, regardless of when the incident occurred. This is an allegation that he was harassing a State's witness. This is information that reflects so negatively on him that the State used it after he was found guilty to argue that he should be in jail pending sentencing. Evidence of an attempt to intimidate a witness is evidence of consciousness of guilt. It doesn't show that Neble had a bias against the defendant. It shows that the defendant had continuing aggression toward Neble and Hopper, the people that he was on trial for shooting at. So I'd argue that it would have been unreasonable for the defendant to use that information at trial. I'd also note on the prejudice prong that the defense did attempt to discredit Neble via a very similar argument by our suggesting she was biased against the defendant and brought up in cross-examination of Neble an incident alleged to have occurred at a Johnston City restaurant apparently pretty recently before the trial had occurred. So the defense hasn't shown that an attempt to impeach her with evidence of another recent interaction between Neble and the defendant would have changed the verdict. And again, the defendant's conviction didn't turn on Neble's testimony alone either. It was based on multiple lay witnesses, the two officers, and the 911 tapes. And I would note that those 911 tapes are unlike other 911 tapes that usually think of them occurring after a crime has occurred. These people were on the phone with the 911 dispatcher as the gunshots were being fired. So it's a contemporaneous account of what both Hopper and Neble were seeing and hearing. And it's all on tape. It was admitted into evidence. And the court noted that Hopper's testimony was credible and that the defendant was guilty beyond a reasonable doubt based in part on that 911 evidence, which is stark. So for these reasons, this Court should affirm. Unless there are further questions. Thank you. Ms. Butler? The beauty in this instance is Mr. Taylor's errant lawyer in trial. I can criticize him rather well since that was me. Anyway, I want to answer the questions that you posed to counsel. Why in the talking of the waiver argument, I believe it was Justice Douglas in Brady, but I could be mistaken. He says basically in looking at his violations, that if in fact there has been a Brady violation, that it goes to the fundamental due process of a proceeding, because if in fact something has happened that calls into question evidence supporting the conviction or such that it, well, changed the conviction, excuse me, then that is so fundamental that there's no issue of a waiver as it relates to that violation. I think that's true if the information is truly an exculpatory or tends to be exculpatory. But you've already said this would not have been exculpatory. Yes. I hadn't gotten to the point that I was trying to drive out. Okay, I apologize. No, no, no, no, no, no. But anyway, the other question I believe that I was, when did the defense learn about this or why did the state, your question about why did the state first start with the question about his brain injury? Because he walked into the courtroom with a walker was the reason. So they had to explain, I guess, the reason that he had a walker or what have you. Anyway, that's when it came to light and that's the explanation of the question, at least in part, why did they bring it up then? Conceivably, it never would have been brought up. Now, the significance of that is, and the question is, what does the brain injury, if it's not exculpatory, well, it may go to the fact that he's telling tales that are incredulous. He testified, it's in the record, that he hit a truck at 80 miles an hour and he wasn't wearing his helmet. Well, you know, being a motorcycle rider, I'd say that's kind of craziness because he would have been killed, not given a brain injury. His tale about his injury makes him very difficult to believe. Deputy Graskowitz, one of the chain witnesses on the search warrant of the items that were taken out of Mr. Taylor's house, I questioned him if he knew Mr. Hoppers and over the years, did he know Mr. Hoppers? He said yes. And he also testified that I wouldn't believe anything Mr. Hoppers said. So the point being is, I believe at least showing that he's incredulous, he tells an incredulous story, goes to the issue of whether or not the court can or should have believed. If I had been given that information prior to the guy taking the stand, the outcome of this case, I believe, might have been different. Why? Tell me why. Because the two witnesses who actually said anything about Mr. Taylor committing offenses was Niebel and Hopper. I'm saying Ms. Niebel says, when she was cross-examined, that she did not see Mr. Taylor with a gun, 6-28-16. That's exculpatory, and you got that out of her. You also got it out that nobody would believe Hopper. Yes, Your Honor. So what I'm trying to figure, help me figure out your argument, why this was so important. Because you got out a lot of good evidence, but I'm having trouble understanding why this impeachment is so important. That was things on the fly, Your Honor. If we would have had the information prior to trial, which I believe that we should have, that we would have been able to do a better job of, A, cross-examining, or working on the issue that Mr. Hopper, who's basically the one who has a gun in Mr. Taylor's hands and doing the shooting, we would have been able to cross-examine him, I think, more fully. But as it was, we had to do it on the fly. The State knew for a long time. All right. Thank you, Counsel, for your arguments. Thank you. We will take this matter under advisement and enter a decision in due course, and the Court will stand in recess. If we were in session tomorrow morning at 9 o'clock, we'll zoom in.